[Crim. No. 12694. In Bank. Feb. 20, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. ALFRED JAMES JOHNSON, Defendant and Appellant.

Alfred James Johnson, in pro. per., Robert P. Mandler,

under appointment by the Supreme Court, and Wellman, Contarino & Mandler for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Walter E. Wunderlich, Deputy Attorney General, for Plaintiff and Respondent.

McCOMB, J.—Defendant was sentenced to life imprisonment for the murder of Arthur Rodriguez Noriega. Trial was by the court, jury having been waived on both the guilt and penalty issues. Through no fault of defendant his appeal was not consummated by his trial attorney and substitute counsel has been appointed to represent him on this appeal.

*Facts*: On September 10, 1963, Noriega was fatally shot while on duty at Gil's Chevron Station in South Gate, California. Witnesses testified that he was the only attendant on duty and that he was servicing a white 1959 Ford when two or three shots were heard. They saw a male Negro jump into the Ford and the car immediately sped away with its lights out. There were two other persons in the car. The victim was found lying on his back by the pumps where the Ford had been serviced. When asked ''Who did this to you?'' he replied ''It's on my pants leg.'' This was admitted in evidence for the limited purpose of probable cause. From a license number written on the victim's trousers and the witnesses' description of the 1959 Ford, the police were able to apprehend the car with two of its passengers and to recover the weapon from which the fatal bullets were fired. These two persons were found guilty of first degree murder and were sentenced to life imprisonment.

In June 1964 defendant was arrested in Connecticut in connection with this murder. Sergeants Taylor and Reed from the South Gate Police Department were present on June 22 at the extradition proceedings held in the circuit court in New Haven. The judge advised defendant that he was entitled to an attorney, that any statement he made could be used against him, and that he had a right to remain silent. Upon discovering his age to be under 21 years and that neither of his parents were present, the judge stated that he was going to appoint an attorney to act as his guardian. He appointed a Mr. Boczar who consulted privately with defendant. Defendant then answered that he had been advised and understood the extradition proceedings and he agreed to return voluntarily to California.

Defendant was returned in custody to California and was placed in the South Gate jail. He was interrogated at various times during the next three days by the officers, several times on tape, but he made no incriminating statements until the interview held at 9 p.m. on June 25. He then admitted that he had been one of the three persons who had planned to commit a robbery on September 10, 1963, that they had taken guns for this purpose, and that the plan was that the other two would "jam the man" [i.e., "hold him up"] and that he would collect the money from the cash register at the service station. He denied doing any of the shooting and implicated the driver as having fired the fatal shots. This confession was the sole evidence at the trial linking the defendant to the crime. He contends that he was insufficiently advised of his right to counsel and to remain silent, that he never knowingly or intelligently waived his constitutional rights, and that his confession was the result of improper inducement.

 *Questions*: *First*: DID THE DEFENDANT KNOWINGLY AND INTELLIGENTLY WAIVE HIS CONSTITUTIONAL RIGHTS?

*No.* There is a conflict in the testimony, not only as between the police officers and defendant, but as between the officers themselves. Viewing these as we must in the light of the resolution made by the trial court and any uncontradicted evidence, the following appears in the record.

1) In Connecticut defendant was advised by the court as to his rights in the extradition proceedings;[1] 2) en route to California the officers advised him as to his right to counsel, to silence, and regarding the use against him of any incriminating statements he might make; 3) upon arrival in California the following morning they again advised him and interrogated him about the crime; 4) at 7:30 that evening he was advised by an investigator from the district attorney's office who also interrogated him; 5) on June 24 he was advised by the officers at 4 p.m.; 6) he was advised by them at 7:10 p.m. when they taped an interrogation; 7) on June 25 about 6 p.m. he was advised when they taped a second interrogation; and 8) he was advised at the 9 p.m. interrogation that night. It was at this session that the incriminating statements were made.

---

[1]The issue at the extradition proceedings was the identity of defendant, which he did not disclaim. Guilt or innocence was not in issue. Whether Mr. Boczar was actually an attorney appears to be immaterial at this time.

The following appears significant in connection with the above. The advice given by the court in Connecticut was not pertinent to the pending criminal charges in California and could not serve as warnings therein, but the officers used it as a sort of lodestar when making their warnings to him.

The officers knew that defendant's wife had left Connecticut for Alabama on June 23 to visit defendant's mother and obtain her aid in furnishing an attorney for defendant, and that defendant did not want to return by plane as he wanted to give her sufficient time to get an attorney. He was told that if his wife did not get him an attorney he would be free to make a telephone call and get an attorney as soon as they reached the South Gate jail. When they arrived at 2 a.m. Sergeant Taylor placed a phone call to defendant's mother-in-law to obtain a telephone number of a relative for him. No one asked him if he wanted to call an attorney. The *Escobedo* decision (*Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758]) was filed the day of the Connecticut hearing but during the next three days the officers continued their interrogation.

On the afteroon of June 23 defendant was arraigned in the municipal court and a date was set for the preliminary hearing. The judge asked him if he had a lawyer. Defendant explained that his wife was trying to arrange for one. He did not see an attorney prior to his preliminary examination on July 13, and his wife did not arrive until after that date.

Later that day he was taken to the district attorney's office. The investigator told him that ''this had to be a free and voluntary thing, that anything he said could be used against him, that he didn't have to say anything if he didn't wish, that the *evidence obtained was not admissible in court, but it was an investigative lead, aid.''* (Italics added.)

Three interviews were taped. In the first two the officers prepared the introduction, in which they recited the constitutional warnings, outside of defendant's presence. In the third and crucial interivew the warning was recited at the conclusion. Although they testified that they advised him each time as to these rights, they admitted that on one occasion they failed to warn him of his right to silence; they made no statement as to defendant's response; there was no affirmative showing that defendant consented to waive any or all of his rights; and no one asked him if he wanted counsel or if he waived his right to counsel.

Defendant admitted in the concluding portion of the final tape of June 25th that his confession was voluntary.[2]

On *voir dire* at the trial, defendant, testifying for the purpose of determining the admissibility of the confession, admitted that no one physically forced him to make the statements. He explained, however, that he thought he had to talk "the way they were asking the questions, and the way the conversation was going on off the tape." He said that when he was "denying it they told me nobody would believe me, you know, since other people had pointed to me as being implicated in this"; that they told him "no one would believe him because he had denied everything"; that if the officers were sitting on the jury they "would not believe him they would give him the gas chamber"; and they told him that if he "had to go in the courtroom it would be best for me to go, you know, in the

---

[2] "Taylor . . . to clarify the record and the tape, have any of the officers that you have been handled by threatend you in any manner to force you to make the statement that we have just taken down on this tape recorder?

"Johnson. No.

"Taylor. In other words it's a free and voluntary statement, that's the truth?

"Johnson. Yes.

"Taylor. That there have been no threats made by any officer including Officer Reed or myself that would have induced you to make this recording?

"Johnson. No.

"Taylor. You made it freely and voluntarily because you wanted to clear the matter up as we previously described?

"Johnson. Yeh. There're no reservations behind this, boy. I really—I mean I really feel something behind it, the reason I want to clear it up behind it too, because I mean I'm real sorry that it happened.

"Taylor. In other words, you're indicating that your conscience is bothering you, and you want to clear it up? Now I don't mean to put words in your mouth, but is that what you would like to have us believe?

"Johnson. Yes. In other words, I wouldn't say my conscience—I'd say I'm real sorry that this whole thing happened, you know. Because I really mean that.

"Reed. All right, now wait. I want to say one other thing. I think Sgt. Taylor has already said it, but I'd like to reiterate on it. I heard you advised of your constitutional rights in New Haven in the court by the judge, is that correct?

"Johnson. Yes.

"Reed. He told you you were entitled to an attorney?

"Johnson. Right.

"Reed. He even had an attorney represent you as your guardian because you're under twenty-one, isn't that correct?

"Johnson. Correct.

"Reed. And—uh—he told you that you didn't have to make any statements unless you had an attorney and—uh—that your statements would be used against you?

"Johnson. Correct.

"Reed. And I have advised you of that haven't I?

"Johnson. Yes."

best light, and by me denying it would show malice and hatred like I went in to kill somebody, like I was the—they said they didn't feel like I was the one that did it, but by me denying it *and not saying anything* would show malice to the jury." (Italics added.) On another occasion they "brought up this malice again and asked me, you know, was I a Muslim or something like that; since there wasn't nothing taken it might have been I just went in and shot a white man down for nothing." He said he figured he might have been the victim of a frame-up because they said he was charged with first degree murder and "guys have pointed you out as being the one that pulled the trigger and the State of California says I must pay for it."

He explained that he didn't think they would use the tapes and thought it was "just investigations," because of what the district attorney's investigator had told him and because Reed had told him he didn't think the recordings would be played in court. He added "if I had known that I didn't have to really say anything I wouldn't have said nothing."

He also claimed that while he was in the jail he suffered from a body rash and had complained about it but received no treatment until after the recordings were completed. The only relative he saw was his mother-in-law, and the officers took him to her home (the purpose for this does not appear), but they didn't tell him he had a chance to talk to her about anything, that she didn't ask him how he was. and he didn't tell her about the rash as she was not "somebody real close to me."

No rebuttal was offered to the above declarations.

█ It is the duty of the reviewing court to examine the uncontradicted facts in order to determine independently whether a confession was voluntary. (*People* v. *Trout* (1960) 54 Cal.2d 576, 583 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418].) The issue, as with all matters of waiver. is to be resolved upon the whole record. (*People* v. *Lara* (1967) 67 Cal.2d 365, 376 [62 Cal.Rptr. 586, 432 P.2d 202].) The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused. (*Johnson* v. *Zerbst* (1938) 304 U.S. 458, 464 [82 LEd. 1461, 1466 58 S.Ct. 1019, 146 A.L.R. 357].)

█ The accusatory stage had been reached and defendant was entitled to the assistance of counsel and to the right of

freedom from self-incrimination. Knowledge of these rights, either through advisement or through other sources of information, and intelligent understanding thereof, must be proved by the People in order to make his incriminating statements admissible. █ We are not here concerned with a consideration of section 13 of article VI of the Constitution. There was no evidence other than his confession. That section could not save the judgment of conviction if the confession is inadmissible. (*People* v. *Brommel* (1961) 56 Cal.2d 629, 634 [15 Cal.Rptr. 909, 364 P.2d 845].)

█ One warning has been held sufficient to cover subsequent interrogations. (*People* v. *Sievers* (1967) 255 Cal.App. 2d 34 [62 Cal.Rptr. 841].) It would be a factual question in each case. A series of conflicting warnings might well negate the effect of warnings that were properly given.

█ The officers recognized their obligation under the *Escobedo* decision to advise defendant of his rights, and they recorded on tape their statements that they had so advised him. They did not record these statements in his presence; they did not recognize any necessity or desirability to obtain or to record waiver by defendant or acknowledgment that the warnings had been given to him, or any affirmative statement that he understood them. They were aware that with a first degree murder charge in issue he was in need of counsel, they knew that his family was making some effort to provide counsel, that he was desirous of having counsel, that he was obviously of limited financial resources, that a reasonable period of time might be necessary to obtain private counsel, and that this was not a completely unsolved case or one that required immediate action. Two of the participants were serving life sentences. Defendant was a minor, without benefit of counsel, family or friends to advise him. The officers proceeded with their interrogations. They placed great reliance on the fact that the Connecticut court had specifically warned defendant in the extradition proceedings. They ignored the concern shown by the California court at the arraignment proceedings in its inquiry regarding counsel for the defendant.

█ Failure of defendant to request counsel is not the determining factor. (*People* v. *Dorado* (1965) 62 Cal.2d 338, 349 [42 Cal.Rptr. 169. 398 P.2d 361].) The *Miranda* (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) rules are not applicable because of the time factor: .(*People* v. *Rollins* (1967) 65 Cal.2d 681. 686 [56 Cal.Rptr. 293, 423 P.2d 221].) Nor was defendant's

apparent cooperation in submitting to taped interviews necessarily an indication that he had understood and consented to a waiver of his right to an attorney and to silence.

■ If there was conflicting evidence, or if the facts admit of substantially conflicting inferences, the admissibility of the confession might depend on determining what was the motivating cause. (*People* v. *Ditson* (1962) 57 Cal.2d 415, 433 [20 Cal.Rptr. 165, 369 P.2d 714].) ■ Promises made by an officer or a person in authority, express or clearly implied, of leniency or advantage for the accused, if it is a motivating cause of the confession, is sufficient to invalidate a confession and make it involuntary and inadmissible as a matter of law. (*People* v. *Brommel, supra,* 56 Cal.2d 629, 632.) It is not the bare language of inducement but the nature of the benefit to be derived by a defendant if he speaks the truth that has been held to distinguish permissible and impermissible police conduct. (*People* v. *Hill* (1967) 66 Cal.2d 536, 549 [58 Cal.Rptr. 340, 426 P.2d 908].)

The People offered in evidence defendant's admissions at the end of the last tape on June 25 and the fact that he had requested to see the officers on June 24 and June 25 in proof of their contention that his confession was free and voluntary without promise of reward or immunity and that it was not incumbent upon the trial court to accept his version of the manner in which the confession was obtained. ■ Defendant admitted that he had not been physically coerced and that no specific promises had been made to him, but he went on to explain why he felt a compulsion to talk. It appears to be reasonable to consider his testimony on *voir dire* as presenting new uncontradicted evidence which goes to show a motivating cause for his statements. It is appropriately before this court on review of the "totality of the circumstances" which we must examine under the *Escobedo* rules.

■ Defendant testified that the officers told him his companions had accused him of shooting the victim, and that there was a first degree murder charge under investigation for which he could get the gas chamber. There was evidence that they exhorted him to tell the truth and indicated that all they were interested in "is the truth." However, he stated they also told him no one would believe him because he denied everything, if they were the jury they would give him the gas chamber, if he had to go into the courtroom it would be best for him to go in the best light, and by denying it and not saying anything this would show malice and hatred, or just a senseless killing of a white man.

This appears to be more than merely pointing out to a suspect that which flows naturally from a truthful and honest course of conduct. It carries the implication that by cooperating and telling what actually happened he might not be accused of or found guilty of first degree murder (i.e. more lenient treatment by the court or jury). To someone unskilled and uncounseled in the law it might have offered a hope that since no money was taken in the robbery and if, as he claimed he did not do the shooting, that he might be cleared of any serious charges. Because of the felony-murder rule his statements amounted to a confession of first degree murder (see Pen. Code, § 189). It stretches the imagination to believe that he knowingly and intelligently waived his right to be free from self-incrimination.

■ *Second.* WERE THERE OTHER CIRCUMSTANCES TO SHOW THAT DEFENDANT WAS AWARE OF HIS CONSTITUTIONAL RIGHTS?

*No.* The evidence shows that defendant was a minor. This fact alone would not invalidate a confession knowingly and intelligently made (*People* v. *Lara, supra,* 67 Cal.2d 365, 378-391 [62 Cal.Rptr. 586, 432 P.2d 202]) but it is relevant to the question of his maturity and awareness of rights. No showing was made at the trial that defendant had a criminal history or any sophistication in courtroom or police procedures. Many of the cases that have been called to our attention in this proceeding show a greater awareness of rights or a more careful effort on the part of the investigating officers to obtain and record defendant's waiver and consent.

The judgment is reversed.

Traynor, C. J., Peters, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.