[Crim. No. 12878. Fourth Dist., Div. Two. June 21, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
GERRY JOHNS, Defendant and Appellant.

## COUNSEL

Bruce M. Leyden, under appointment by the Court of Appeal, and Berry Johns, in pro. per., for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Robert M. Foster, Steven V. Adler, John W. Carney and Peter Quon, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**McDANIEL, J.**—Defendant, Gerry Johns, appeals from a judgment of conviction based upon a jury verdict finding him guilty of robbery (Pen. Code, § 211) and murder (Pen. Code, § 187) and also finding to be true the allegations that he was armed with a firearm during the commission of both offenses. (Pen. Code, § 12022, subd. (a).) Except with respect to certain modifications of defendant's sentence, we shall affirm the judgment.

### FACTS

San Bernardino County Sheriff's Deputy Thomas Seelig was responding to a call in Cucamonga at approximately 1 a.m. when he observed two black males running from the direction of two business establishments, a water company and a Jack-in-the-Box restaurant. The two subjects entered a ve-

hicle parked across the street. Deputy Seelig pulled in behind the parked vehicle with the intention of effecting an investigative stop. Before he could do so, however, the vehicle pulled out without its lights on.

Deputy Seelig then followed and attempted to stop the vehicle, but it failed to respond to his red lights and siren. As Deputy Seelig followed in close pursuit he was informed by radio dispatch that a patron had been shot at the Jack-in-the-Box and appeared to be dead. At one point during the chase he observed both doors of the fleeing car open and sparks fly out from underneath. By ramming the car he was finally able to bring it to a halt. The driver immediately exited the car and began to run. Deputy Seelig ordered the subject to stop; when he failed to do so, Seelig drew his service revolver and fired once, striking the subject. The wounded individual was later identified as Gerry Johns, defendant herein.

The incident at the Jack-in-the-Box began when two black males were observed attempting to enter the restaurant shortly after 1 a.m. They were unable to gain entry because the restaurant was closing and the doors had been locked. Within minutes, two persons approached a vehicle at the drive-in window of the restaurant. The four young women in the car had placed an order and were preparing to pay for their purchases.

Teresa Sandoval was seated in the passenger seat behind the driver, her sister, Cecelia Sandoval. Teresa saw two figures approach the driver's side and heard a voice demanding money. A hand reached in through the window and grabbed her wallet. She heard her sister in a scared, shaky voice say "take it," referring to her purse and wallet. Then she heard a shot and saw her sister slump forward, bleeding. Cecelia had received a fatal wound to the head from a shotgun.

A shotgun in two pieces was later found in the area where Deputy Seelig had observed sparks coming from beneath Johns' vehicle. The gun had three live cartridges in its magazine and one spent cartridge in its chamber. The pellets and wadding removed from Cecelia's wound were similar to those found in the shotgun. Teresa Sandoval's wallet was found in Johns' vehicle.

Defendant was charged with two counts of robbery and one count of murder. It was alleged as to all three counts that he was armed with a firearm.

After a jury trial, he was found not guilty of the count charging the robbery of Cecelia, and guilty of the count charging the robbery of Teresa and the murder of Cecelia. The allegations that he was armed during both offenses were found to be true. Defendant was sentenced to the midterm of

three years for the robbery plus one year enhancement for the armed allegation, followed by 25 years to life for the murder plus one year enhancement for being armed.

Defendant appealed the judgment, contending that the trial court erred in (1) denying his motion to suppress on the basis of an illegal stop by Deputy Seelig, (2) denying his motion to exclude certain pretrial statements to the police which he contends were coerced, (3) sentencing him on both the murder and robbery convictions and imposing two enhancements, because the crimes comprised an indivisible course of conduct, and (4) sentencing him on first degree murder, because the jury failed to determine the degree of the murder conviction.

I

DISCUSSION

Defendant contends that the trial court erred in denying his motion to suppress certain evidence because Deputy Sheriff Seelig's initial attempt to stop defendant's vehicle was not based on probable cause. The contention is meritless if not ludicrous.

Deputy Sheriff Seelig testified that he was responding to a call when he observed two individuals running toward a parked car from the direction of two business establishments, a water company and the Jack-in-the-Box restaurant. The time was shortly after 1 a.m. Deputy Seelig noted that both businesses were closed. These circumstances led the deputy to suspect that the two subjects might be involved in a burglary. Accordingly, he made a U-turn and pulled up behind the parked vehicle. At that point, the vehicle sped away and the chase ensued.

■ It is well settled that "in order to justify an investigative stop or detention the circumstances known or apparent to the officer must include specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity. Not only must he subjectively entertain such a suspicion, but it must be objectively reasonable for him to do so: the facts must be such as would cause any reasonable police officer in a like position, drawing when appropriate on his training and experience [citation], to suspect the same criminal activity and the same involvement by the person in question." [Fn. omitted.] (*In re Tony C.* (1978) 21 Cal.3d 888, 893 [148 Cal.Rptr. 366, 582 P.2d 957]; *People v. Leyba* (1981) 29 Cal.3d 591, 597 [174 Cal.Rptr. 867, 629 P.2d 961].)

■ Applying the foregoing test to the facts as described, we conclude that it was objectively reasonable for Deputy Seelig to entertain a suspicion that the subjects whom he observed were involved in a burglary. The lateness of the hour; the fact that the businesses were closed, and that the two persons were running from the direction of the businesses to their parked car, are all facts which reasonably support Deputy Sheriff Seelig's suspicions.

We conclude that the initial attempt to stop the automobile was lawful. The motion to suppress was properly denied.

## II

Defendant next contends that the trial court improperly denied his motion to exclude certain pretrial statements made to the police. He argues that two earlier statements to the police were illegally coerced and involuntary, and that the third, which was admitted into evidence, was thereby tainted.

■ As a reviewing court, it is our duty to "examine the uncontradicted facts surrounding the making of the statements to determine independently whether the prosecution met its burden and proved that the statements were voluntarily given without previous inducement, intimidation or threat. [Citations.] With respect to the conflicting testimony, the court must 'accept that version of events which is most favorable to the People, to the extent that it is supported by the record.' [Citation.] The burden of proof which must be sustained by the prosecution on questions of voluntariness is proof beyond a reasonable doubt. [Citations.]" (*People* v. *Hogan* (1982) 31 Cal.3d 815, 835 [183 Cal.Rptr. 817, 647 P.2d 93].)

The police questioning of defendant, which consisted of three separate interviews, was conducted by two San Bernardino County Sheriff's detectives, Detectives Clifford and Malmberg. The detectives began the first interview at approximately 11:30 a.m. on February 21 in Ontario Community Hospital, where defendant had been admitted some eight hours earlier as a result of the gunshot wound he received during the chase. Defendant was administered anesthesia in preparation for surgery. Surgery was concluded at approximately 5:45 a.m. Thereafter, defendant was periodically administered the pain-killing drug and muscle relaxant, Demerol.

■ As a result of the medication, defendant claims that his statements during the first interview were not the result of his " ' "rational intellect and free will." ' " (*People* v. *Sanchez* (1969) 70 Cal.2d 562, 572 [75 Cal.Rptr. 642, 451 P.2d 74].) The record belies defendant's claim. Detective Clifford's uncontradicted testimony was that defendant initially answered his

questions concerning defendant's name, the spelling of his name, his age, his mother's name and maiden name accurately and alertly. Defendant was read his *Miranda* (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) rights and agreed to talk with the detectives. Defendant himself recalled much of the substance of the interview at his preliminary hearing. The anesthesiologist who treated defendant testified that defendant would have been conscious about one and a half hours after surgery, or approximately 7:15 a.m., four hours before the interview. The anesthesiologist further testified that Demerol will sedate a patient but does not usually affect the mental faculties or the ability to think rationally or exercise free will.

Furthermore, defendant categorically denied having any knowledge of, or of having planned or participated in either the robbery or murder. Therefore, there is no basis in fact or in logic for concluding that any of his statements were coerced or in any way "tainted" his later statements.

A second interview commenced the next evening in the San Bernardino County hospital jail ward. Defendant was read his *Miranda* rights and agreed to talk to the detectives. Between the first and second interviews defendant's alleged accomplice, one James Wesley Randle, had apparently been interviewed and denied being the "triggerman."

This time Detective Malmberg questioned defendant closely and aggressively. Detective Malmberg indicated repeatedly that he did not believe defendant's story of the day before. Defendant was pressed to tell the truth. At one point, Detective Malmberg appeared to be exasperated and threatened to leave, stating: "If you want to tell us the truth, we will listen to you, and if you want to tell us some more lies turn [the tape recorder] off right now. We are going to leave and let the chips fall where they may with what Randle's told us and everything. You know what I mean?" At a later point in the interview, Detective Malmberg stated: "I can't handle this man, I'm leaving. I'll see you later. We'll see you—you know what? When the jury comes back and says take him to San Quentin to sit on death row—."

During this interview defendant admitted that he was present during the robbery, but denied having planned or participated in either the robbery or the murder. Defendant later acknowledged that he had lied during both the first and second interviews. He further acknowledged that he was made no promises of leniency in return for anything he said.

Upon defendant's request, the detectives returned four days later, February 26, for a third interview. Defendant was read his *Miranda* rights and agreed to talk. This time, defendant implicated himself and Randle in the

commission of the offenses. He later testified that he was not made any promises in return for his statements.

It is against this factual background that we must evaluate defendant's claims that he was "psychologically coerced" to give the third interview because of the detectives' "threats" and implied "promises of leniency" during the second interview.

"It is well settled that a confession is involuntary and therefore inadmissible if it was elicited by any promise of benefit or leniency whether express or implied. (*People* v. *Johnson* (1969) 70 Cal.2d 469, 479 . . . see also *People* v. *Hill* (1967) 66 Cal.2d 536, 549 . . . .) However, mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary. [Citation.] The distinction that is to be drawn between permissible police conduct on the one hand and conduct deemed to have induced an involuntary statement on the other 'does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth as represented by the police.' (*People* v. *Hill, supra,* 66 Cal.2d at p. 549.) Thus, '[w]hen the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct,' the subsequent statement will not be considered involuntarily made. (*Ibid.*) On the other hand, 'if . . . the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible. . . .' (*Ibid.*)" (*People* v. *Jimenez* (1978) 21 Cal.3d 595, 611-612 [147 Cal.Rptr. 172, 580 P.2d 672].)

In determining whether or not an accused's will was overborne or whether his confession was involuntary because of psychological pressure, "the totality of the circumstances . . . must be taken into account." (*People* v. *Sanchez, supra,* 70 Cal.2d at p. 572; *People* v. *Hogan, supra,* 31 Cal.3d at p. 841.) The interview "must be considered as a whole in the context of the development of the dialogue between interviewers and interviewee and in the light of the totality of the circumstances surrounding the confession." (*People* v. *Andersen* (1980) 101 Cal.App.3d 563, 578 [161 Cal.Rptr. 707].)

Having already determined that the first interview was neither coerced nor incriminatory, the sole issue here concerns the content of the second interview, i.e., whether the detective's remarks amounted to coercive threats or promises of leniency of a nature sufficient to categorize the defendant's statements as involuntary.

As to the statements by the detective urging defendant not to lie, it is well settled that admonitions to tell the truth do not amount to coercion. (*People* v. *Hill, supra,* 66 Cal.2d 536, 548-549.) The additional fact that defendant had obviously and admittedly been lying throughout the first and second interviews indicates that the detective's exhortations were "appropriate and timely and not . . . extraneously dragged in as a club with which to bully the suspect." (*People* v. *Andersen, supra,* 101 Cal.App.3d at p. 578.)

Defendant also contends that his free will was overborne by the "threats" and "implied promise of leniency" contained in the detective's statement: "We'll see you . . . [w]hen the jury comes back and says take him to San Quentin to sit on death row."

Defendant contends that the situation here is analogous to *People* v. *Johnson, supra,* 70 Cal.2d 469. In *Johnson,* defendant, a black minor, had been arrested in Connecticut and extradited to California for a felony murder committed in Los Angeles County. After his return to California he confessed to the murder. The California Supreme Court reversed on the basis of several factors: (1) Johnson never waived his constitutional rights, (2) he was misled as to the manner in which his statements could be used against him, (3) he was denied medical attention until he confessed, and (4) he was threatened by the police in an effort to obtain a statement.

With regard to the police coercion, Johnson was told by the police officers that his companions had accused him of the murder, that he faced a first degree murder charge and that he could get the gas chamber. They told him that no one would believe his story, and that if they were the jury they would give him the gas chamber. They said that his denial of the murder would show malice and hatred, or just a senseless killing of a white man.

The *Johnson* court found that the police had gone beyond merely exhorting defendant to tell the truth. Their statements had "carrie[d] the implication that by cooperating and telling what actually happened he might not be accused of or found guilty of first degree murder (i.e., more lenient treatment by the court or jury)." (*Id.,* at p. 479.)

Viewed in isolation, there is no question that the detective's comment here about seeing defendant in "San Quentin . . . on death row" went beyond mere exhortation to tell the truth. The statement was patently improper; this "tough-guy cop" approach may sell commercials on television, but it will not be tolerated in a real court of law. As events throughout the world daily testify, the rules which restrain the police authorities are the first line of defense against tyranny in a free society.

We cannot too strongly condemn police misconduct. Nevertheless, the law requires that we focus not on a single isolated phrase, but rather analyze the interview as a whole in the totality of the circumstances to determine whether defendant's statements were actually coerced by threats or false promises. (*People* v. *Andersen, supra,* 101 Cal.App.3d at p. 579.) We note, first, that the reference to "death row" occurred just once; defendant himself confirmed this. Further, we note that there was no mention of the degree of any charge pending against defendant together with an implied promise of a reduced charge in return for a confession, as occurred in *Johnson.* Indeed, while the detective's comment may have been threatening, we find no promise of leniency, either express or implied, in any of the detective's remarks. As the court in *Hill* stated, the distinction between permissible and impermissible police conduct "does not depend upon the bare language of inducement but rather upon the nature of the *benefit* to be derived by the defendant if he speaks the truth as represented by the police." (*People* v. *Hill, supra,* 66 Cal.2d at p. 549, italics added.)

Looking at the second interview as a whole, defendant's own testimony belies his claim of coercion or intimidation. Defendant did not become confused, break down or lose his general composure under the detectives' close questioning. (Compare *People* v. *Hogan, supra,* 31 Cal.3d at p. 842.) Indeed, defendant admittedly *lied* to the detectives throughout the interview. He only decided to tell the truth some *four* days after the second interview. This is not the behavior of one whose free will has been overborne. Moreover, the causative nexus between the detective's comments during the second interview and defendant's admissions four days later during the third, is extremely attenuated, if not nonexistent.

Therefore, viewing the interviews as a whole in all their attendant circumstances, we are persuaded beyond a reasonable doubt that defendant's statements were not coerced by threats or promises of leniency, but were made freely and voluntarily.

### III

■ Defendant contends that he was improperly sentenced to state prison for both the robbery and murder convictions. He argues that the two sentences constitute double punishment in violation of Penal Code section 654 because he had only one criminal objective, to aid his codefendant in a robbery.

Defendant overlooks the fact that he was convicted of the murder of Cecelia Sandoval as well as the robbery of her sister, Teresa. It is well settled that a defendant may be punished for multiple convictions if during an in-

divisible course of conduct he commits crimes of violence against *different* victims. (*Neal* v. *State of California* (1960) 55 Cal.2d 11, 20-21 [9 Cal.Rptr. 607, 357 P.2d 839]; *People* v. *Miller* (1977) 18 Cal.3d 873, 885 [135 Cal.Rptr. 654, 558 P.2d 552].) When a person " 'commits an act of violence with the intent to harm more than one person or by means likely to cause harm to several persons,' his greater culpability precludes application of section 654. (*Neal* v. *State of California, supra,* 55 Cal.2d 11, 20-21.)" (*People* v. *Miller, supra,* 18 Cal.3d at p. 885.)

The robbery of Teresa Sandoval and the murder of Cecelia Sandoval fall squarely within the category of crimes of violence "likely to cause harm to several persons." Therefore, defendant was properly sentenced on the robbery and murder convictions.

■ Notwithstanding the propriety of separate punishments for the robbery and murder, we conclude that the trial court improperly imposed separate one year enhancements under Penal Code section 12022, subdivision (a) for being armed with a gun during the commission of the robbery and murder.

It is well settled that if all the charged offenses effectively comprise an indivisible transaction, then section 12022, subdivision (a) may be invoked only once and not in accordance with the number of victims. (*In re Culbreth* (1976) 17 Cal.3d 330, 333 [130 Cal.Rptr. 719, 551 P.2d 23]; *People* v. *Freeman* (1979) 95 Cal.App.3d 917, 924-925 [157 Cal.Rptr. 454].) This is true even when multiple punishments on the underlying offenses are proper because the defendant has committed separate acts of violence against different victims. (*In re Culbreth, supra,* 17 Cal.3d at p. 334; *People* v. *Johnson,* 38 Cal.App.3d 1, 12.)

Here, the record shows unmistakably that the murder was incident to the robbery and that the two offenses constituted an indivisible course of conduct. Accordingly, we shall order that the judgment be modified to provide that defendant shall serve only one additional period of confinement pursuant to Penal Code section 12022, subdivision (a).

IV

■ Defendant's final contention is that the trial court improperly sentenced him to state prison for murder in the first degree because the jury failed to determine which degree of murder he was guilty of.

Penal Code section 1157 provides: "Whenever a defendant is convicted of a crime or attempt to commit a crime which is distinguished into degrees,

the jury, or the court if a jury trial is waived, must find the degree of the crime or attempted crime of which he is guilty. Upon the failure of the jury or the court to so determine, the degree of the crime or attempted crime of which the defendant is guilty, shall be deemed to be of the lesser degree."

Here the jury returned a separate verdict finding defendant "guilty of the crime of MURDER, as charged in the information . . . ." The information merely alleged that defendant had committed murder with malice aforethought in violation of Penal Code section 187. Hence the jury clearly failed to determine the degree of the murder for which defendant was found guilty.

The People quite reasonably contend that in substance if not form, defendant was clearly charged with and found guilty of felony murder, which under Penal Code section 189 is punishable as murder in the first degree. The jury was instructed exclusively on first degree felony murder. The evidence amply supported a finding of felony murder. The findings of guilt on both the robbery and murder charges leave no doubt that the jury fully *intended* to convict of first degree felony murder. Unfortunately, on this point, form triumphs over substance, and the law is traduced.

In *People* v. *Beamon* (1973) 8 Cal.3d 625 [105 Cal.Rptr. 681, 504 P.2d 905], the seminal case construing Penal Code section 1157, the California Supreme Court stated: "We cannot assume, contrary to the clear legislative direction, that because a factual finding was made which would have warranted a determination of first degree robbery, the jury unmistakably intended [citation] to make that determination when it refrained from expressly fixing the degree. The degree of the crime must, in accordance with the statute, be deemed to be of the second degree." (*Id.*, at p. 629, fn. 2; see also *People* v. *Dixon* (1979) 24 Cal.3d 43, 51-52 [154 Cal.Rptr. 236, 592 P.2d 752].) Although *Beamon* involved a different felony from the one herein, the same implacable logic (if that be the word) applies.

Therefore, we are compelled to reduce the conviction to second degree.

## DISPOSITION

The judgment is modified by striking one of the section 12022.5 enhancements, and by fixing the degree of murder as in the second degree. As so modified, the judgment is affirmed. The sentence is vacated and the case

remanded to the trial court for resentencing in accordance with law and reflecting the foregoing modification.

Kaufman, Acting P. J., and Rickles, J., concurred.

A petition for a rehearing was denied July 20, 1983, and the petitions of both parties for a hearing by the Supreme Court were denied October 6, 1983.