[Crim. No. 13987. Fourth Dist., Div. One. June 14, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
NORMAN SAMUEL WILLIAMS, Defendant and Appellant.

146

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Christine Zilius, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Robert D. Marshall and Linda A. Cabatic, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

WIENER, J.—After entering a "slow plea" based on the preliminary hearing transcript, Norman Samuel Williams appeals from the judgment convicting him of murder (Pen. Code, § 187, subd. (a)),[1] rape (§ 261, subd. (2)) and first degree burglary (§ 459, former § 460, subd. 1). Williams also

---

[1] All statutory references are to the Penal Code.

appeals the court's special circumstance findings based on the rape and burglary. (§ 190.2, subds. (a)(17)(iii), (a)(17)(vii).) The court sentenced Williams to life imprisonment without possibility of parole for the murder accompanied by special circumstances (§ 190.2, subd. (a)), and to concurrent upper terms of eight and six years, respectively, for the rape and burglary. (§§ 264, 461, subd. 1.) We modify the judgment of conviction by reducing Williams' murder conviction from first to second degree and by striking the special circumstance findings. As modified, we affirm the judgment. We also remand the matter for resentencing on second degree murder and direct the court upon resentencing to stay the sentence previously imposed for rape.

*Facts*

Williams raped and murdered 11-year-old Deanna R. during the early morning hours of July 2, 1980, while burglarizing the apartment in which she lived.

*Discussion*

I

Williams challenges all of his convictions, arguing they were based on involuntary confessions he made to the police. He also says the court should have made express oral findings regarding voluntariness so as to allow meaningful appellate review of the voluntariness ruling. (See *Johnson* v. *State* (Alaska App. 1981) 631 P.2d 508, 513.) In *Johnson,* the court carefully noted, "we do not mandate written opinions or extensive, formalistic elaborations on the part of the trial court. A brief statement of the trial court's findings concerning contested facts essential to its decision is all that is required." (*Id.,* at p. 513, fn. 16.)

California law on this point is that "[t]he judge's [voluntariness] determination must be reflected in the record with unmistakable clarity although he need not make formal written findings." (*People* v. *Rowe* (1972) 22 Cal.App.3d 1023, 1029 [99 Cal.Rptr. 816], citing *Sims* v. *Georgia* (1967) 385 U.S. 538, 544 [17 L.Ed.2d 593, 598, 87 S.Ct. 639].)

We fail to see any substantive or practical differences between the Alaska and California standards. Here, the court complied with both. After counsel's arguments regarding the only contested facts essential to its voluntariness determination, the court stated: "[N]ever once have I heard any evidence that anybody held out a carrot. I don't think there was any, you know, 'we'll get you for murder two—' or anything like that. But there is nothing

like that in this case. So I'm convinced that the District Attorney has proved beyond a reasonable doubt that he followed the applicable law in eliciting [Williams'] confession." Thus the court found Williams' confession was not induced through implied threats or promises and, on that basis, ruled Williams' confession was voluntarily made. The court's voluntariness determination is reflected in the record with sufficient clarity to allow our review of its ruling. (*People* v. *Rowe, supra,* 22 Cal.App.3d at p. 1029.)

■ Turning to the merits, it is our function to "examine the uncontradicted facts surrounding the making of the statements to determine independently whether the prosecution met its burden and proved that the statements were voluntarily given without previous inducement, intimidation or threat. [Citations.] With respect to the conflicting testimony, [we] must 'accept that version of events which is most favorable to the People, to the extent that it is supported by the record.' [Citation.] The burden of proof which must be sustained by the prosecution on questions of voluntariness is proof beyond a reasonable doubt.[2] [Citation.]" (*People* v. *Hogan* (1982) 31 Cal.3d 815, 835 [183 Cal.Rptr. 817, 647 P.2d 93]; accord *People* v. *Jimenez* (1978) 21 Cal.3d 595, 608-609 [147 Cal.Rptr. 172, 580 P.2d 672].) " 'In determining whether the defendant's confession is the product of a rational intellect and a free will, the totality of the circumstances surrounding the confession must be taken into account.' [Citations.]" (*People* v. *Haydel* (1974) 12 Cal.3d 190, 198 [115 Cal.Rptr. 394, 524 P.2d 866].)

Police Investigator Brad Frank questioned Williams on three separate occasions following Deanna's death. The first interview occurred late in the day on July 2, followed by the second and third interviews on July 6 and 7. Williams initiated the July 2 and 6 contacts through his former probation officer, Dan Hutton. Frank initiated the July 7 contact. Williams received and waived his *Miranda* rights (*Miranda* v. *Arizona* (1966) 384 U.S. 436, 478-479 [16 L.Ed.2d 694, 725-726, 86 S.Ct. 1602, 10 A.L.R.3d 974]) on all three occasions.

The July 2 interview occurred at Hutton's office. Hutton was present for the first part of the interview and Williams' mother was present throughout. Williams denied he raped and murdered Deanna and burglarized her apartment.

The July 6 interview occurred at the police station. Hutton was present for most of the interview and Williams' mother and a friend of hers were present throughout. Williams again denied involvement in the crimes.

---

[2]Section 28, subdivision (d) of article I of the California Constitution does not apply to this case. (*People* v. *Smith* (1983) 34 Cal.3d 251, 257-263 [193 Cal.Rptr. 692, 667 P.2d 149].)

The July 7 interview also took place at the police station and represented the turning point in the case. Frank and Police Chief Charles Martin questioned Williams for about an hour in the presence of both of his parents. Williams began by again denying any involvement in the crimes. Martin then described his and Frank's theory of Williams' culpability. Williams then confessed his guilt. Williams' mother, emotionally upset, left the room as Williams began to confess. She returned sometime later. Williams' father remained in the room for the entire confession. Martin then asked Williams' parents to leave the room and Frank obtained two statements from Williams, an oral tape-recorded statement reiterating his confession and a short written statement. Martin assisted Frank in obtaining the written statement. In his statements Williams admitted raping Deanna and burglarizing her apartment, but he denied killing her or intending to hurt her.

Williams challenges both the confession he made in his parents' presence and the two statements he gave Frank and Martin. As to the former, Williams argues Frank and Martin induced him to confess through implied threats and promises. As to the latter, Williams argues his statements should have been excluded as the products of a coerced confession and because Frank and Martin collaborated with him in composing them.

The testimony is contradictory regarding any threats or promises that might have induced Williams' confession. Williams' mother testified Martin prefaced his and Frank's theory of the events by saying "that—he described the things that—about the death penalty, and that when people cooperate with the police, that it's easier for them, and that sometimes they could talk to the officer or the judge or the D.A. and help him." Hutton added he thought he remembered Williams asking Frank about possible penalties during the July 2 interview, and Frank responding that a conviction could result in commitment either to the Youth Authority or to the Department of Corrections. Frank flatly contradicted both Hutton's and Mrs. Williams' testimony. According to Frank, the first reference to the Youth Authority came when Williams raised the subject *after* concluding his confession. Similarly, the first reference to the death penalty came during the latter part of Williams' confession, *after* he had admitted his commission of the crimes, when Martin questioned him about possible accomplices. Faced with this conflicting testimony, we must accept Frank's narration because it is most favorable to the People and is supported by the record. (*People* v. *Hogan, supra,* 31 Cal.3d at p. 835; *People* v. *Jimenez, supra,* 21 Cal.3d at p. 609.) Consequently, any references to the Youth Authority and the death penalty did not induce Williams' confession because they came *after* he admitted his guilt of the crimes. (*People* v. *Nelson* (1964) 224 Cal.App.2d 238, 251-252 [36 Cal.Rptr. 385].)

■ Likewise, Martin's introductory comment that he would tell the district attorney whether he thought Williams was telling the truth or was lying also did not induce Williams' confession. Martin's comment was little more than a variation on the *Miranda* warning that anything a defendant says can and will be used against him in court. As a practical matter, the prosecutor must be told of a defendant's statements in order to use them against him in court. Moreover, it is appropriate for the police to evaluate as well as transmit such statements. Martin promised Williams an evenhanded evaluation. (Compare *People* v. *Brommel* (1961) 56 Cal.2d 629, 633-634 [15 Cal.Rptr. 909, 364 P.2d 845].) We see nothing improper in Martin's comment.

Based on the above, we necessarily conclude Williams' statements were not the products of a coerced confession. For his collaboration argument Williams relies on *Blackburn* v. *Alabama* (1960) 361 U.S. 199 [4 L.Ed.2d 242, 80 S.Ct. 274]. *Blackburn* reversed a robbery conviction based on an involuntary confession. (*Id.,* at p. 211 [4 L.Ed.2d at p. 250].) As the Supreme Court explained: "In the case at bar, the evidence indisputably establishes the strongest probability that Blackburn was insane and incompetent at the time he allegedly confessed. Surely in the present stage of our civilization a most basic sense of justice is affronted by the spectacle of incarcerating a human being upon the basis of a statement he made while insane; and this judgment can without difficulty be articulated in terms of the unreliability of the confession, the lack of rational choice of the accused, or simply a strong conviction that our system of law enforcement should not operate so as to take advantage of a person in this fashion. And when the other pertinent circumstances are considered—the eight- to nine-hour sustained interrogation in a tiny room which was upon occasion literally filled with police officers; the absence of Blackburn's friends, relatives, or legal counsel; the composition of the confession by the Deputy Sheriff rather than by Blackburn—the chances of the confession's having been the product of a rational intellect and a free will become even more remote and the denial of due process even more egregious." (*Id.,* at pp. 207-208 [4 L.Ed.2d at pp. 248-249].)

Although undereducated and virtually illiterate, experiencing difficulty expressing himself, particularly in written form, Williams was neither insane nor incompetent when questioned on July 7. Furthermore, Frank and Martin questioned Williams in the presence of his parents for no more than an hour. Williams' statements made after his parents left the room are consistent with his confession made in their presence. The statements show no incriminating changes attributable to police coercion or collaboration. ■ Finally, Frank's and Martin's assistance in preparing Williams' statements extended no further than suggesting some words to be used (which Williams would

either approve or disapprove), correcting spelling and "putting sentences together for him grammatically." This is unlike the situation in *Blackburn,* where the ". . . Chief Deputy composed the statement in narrative form on the basis of Blackburn's answers to the various questions asked by the officers, and Blackburn signed the confession two days later." (361 U.S. at p. 204 [4 L.Ed.2d at p. 246].) Frank and Martin did not improperly intrude into the preparation of Williams' statements.

Considering the totality of the circumstances (*People* v. *Haydel, supra,* 12 Cal.3d at p. 198), the trial court correctly ruled Williams' confession and statements were voluntarily made.

## II

Williams correctly asserts the trial court's failure to determine the degree of the murder mandates modifying his first degree murder conviction to one of second degree. The trial court found Williams guilty of murder but failed to fix the degree of the crime.[3]

Section 1157 provides: "Whenever a defendant is convicted of a crime or attempt to commit a crime which is distinguished into degrees, the jury, or the court if a jury trial is waived, must find the degree of the crime or attempted crime of which he is guilty. Upon the failure of the jury or the court to so determine, the degree of the crime or attempted crime of which the defendant is guilty, shall be deemed to be of the lesser degree."

Similarly, section 1192 provides: "Upon a plea of guilty, or upon conviction by the court without a jury, of a crime or attempted crime distinguished or divided into degrees, the court must, before passing sentence, determine the degree. Upon the failure of the court to so determine, the degree of the crime or attempted crime of which the defendant is guilty, shall be deemed to be of the lesser degree."

Courts have consistently applied sections 1157 and 1192 strictly and literally in favor of defendants, so much so that "on this point, form triumphs over substance, and the law is traduced." (*People* v. *Johns* (1983) 145 Cal.App.3d 281, 295 [193 Cal.Rptr. 182]; accord *People* v. *Thomas* (1978) 84 Cal.App.3d 281, 285 [148 Cal.Rptr. 532] (Ashby, J., conc.).) The statutes must be applied when the court or the jury inadvertently fails to fix the degree of a defendant's conviction before sentence is imposed. (See, e.g.,

---

[3]The court avoided a similar error with respect to Williams' burglary conviction by stating: "In Count 5 of the Information—Amended Information, the Court will have to find that the Defendant is guilty of *burglary in the first degree,* a violation of Section 459 of the Penal Code." (Italics added.)

*People* v. *Flores* (1974) 12 Cal.3d 85, 93-95 [115 Cal.Rptr. 225, 524 P.2d 353]; *People* v. *Stephenson* (1974) 10 Cal.3d 652, 656 [111 Cal.Rptr. 556, 517 P.2d 820]; *People* v. *Johns, supra,* 145 Cal.App.3d at pp. 294-295; *People* v. *Baeske* (1976) 58 Cal.App.3d 775, 778, fn. 1 [130 Cal.Rptr. 35].) The statutes also apply even if the court or jury returns a specific finding which would warrant a conviction of the higher degree as a matter of law. (*People* v. *Beamon* (1973) 8 Cal.3d 625, 629, fn. 2 [105 Cal.Rptr. 681, 504 P.2d 905]; *People* v. *Thomas, supra,* 84 Cal.App.3d at pp. 283-285; *People* v. *Baeske, supra,* 58 Cal.App.3d at p. 778, fn. 1; *People* v. *Doran* (1974) 36 Cal.App.3d 592, 592-593 [111 Cal.Rptr. 793]; *People* v. *Cox* (1973) 33 Cal.App.3d 378, 381-382 [109 Cal.Rptr. 43].)

In finding Williams guilty of murder the court said: "In Count 1 of the Information, I'm going to find the Defendant guilty as charged in Count 1, on the Amended Information, murder, a violation of Section 187 of the Penal Code." The information alleges Williams murdered Deanna with malice aforethought in violation of section 187. No reference is made to first or second degree murder. Consequently, the court failed to determine the degree of murder of which Williams was guilty. (*People* v. *Johns, supra,* 145 Cal.App.3d at p. 295.) Although the abstract of judgment reflects a first degree murder conviction, the clerk's minute order, consistent with the court's pronouncement, shows Williams guilty of "Count I—Murder 187 PC" but makes no reference to degree. At the sentencing hearing the court again referred generally to Williams' conviction of "guilty of Count I, which was murder" and "[a] violation of Section 187 of the Penal Code, as charged in the first count of the second amended information."

On a nearly identical record in a case involving a robbery conviction (§ 211) accompanied by a firearm use finding (§ 12022.5), the court in *People* v. *Thomas, supra,* 84 Cal.App.3d 281, reduced the defendant's conviction from first to second degree robbery. (*Id.,* at pp. 283-285.) The case against reduction in *Thomas* was even stronger than it is here because the trial court belatedly but ineffectually entered an ex parte order to amend the sentence to reflect a first degree conviction. (*Id.,* at p. 283.) Nonetheless, the appellate court reasoned: "The respondent argues that the court's finding as to the use allegation manifests a finding that the defendant had committed armed robbery and therefore the crime is robbery of the first degree. This argument requires that a finding of degree is implied since it was not expressed as such. Penal Code sections 1192 and 1157 require that the degree must be determined. [Citations.] . . . Following the dictates of *People* v. *Flores* (1974) 12 Cal.3d 85, 95 . . ., and *People* v. *Beamon* (1973) 8 Cal.3d 625, 629 . . ., we conclude that there may not be an *implied* finding of first degree in the instant case and the failure to specifically find

requires the conviction to be of robbery of the second degree." (*Id.*, at pp. 283-284, original italics, fns. omitted.)

Similarly, the record in this case cannot be read to contain an implied finding of first degree murder. We cannot hold Williams' murder conviction is one of first degree on the Attorney General's theory that first degree murder is a prerequisite for special circumstance findings (see § 190.2, subd. (a)) and therefore Williams must be guilty of first degree murder because the court found two special circumstances to be true. This argument, grounded on a process of circular reasoning, is precluded by the applicable statutes and cases. We are legally required to reduce Williams' murder conviction from first to second degree. That reduction, in turn, requires striking the court's special circumstance findings because such findings cannot stand on a conviction of second degree murder. (*Thomas, supra,* 84 Cal.App.3d 281) These modifications necessarily require a remand for resentencing on second degree murder.

### III

Turning to his rape and burglary convictions, Williams argues we must remand for resentencing because the trial court (1) failed to separately state reasons for imposing upper terms for each offense, (2) improperly used the same facts to impose both upper terms, and (3) possibly relied on inappropriate factors to impose the upper term for burglary.

Before imposing sentence on any of Williams' convictions the court stated: "All right. I'm going—as far as aggravation, I'm going to make the following findings: The crime involved great violence, great bodily harm, threat of great bodily harm, other acts disclosing a high degree of cruelty, viciousness, and callousness, whether or not charged as an enhancement under 12022.7. [Cal. Rules of Court, rule 421(a)(1).[4]]

"The victim was particularly vulnerable. [Rule 421(a)(3).] The Defendant's prior adjudications or commissions of crimes as a juvenile are numerous or of increasing seriousness. [Rule 421(b)(2).]

"The Defendant was on probation when he committed the crimes. [Rule 421(b)(4).]

"The only mitigating circumstances I can find is the action of the Defendant once that he was in custody, why he did pretty well admit the matter. [Rule 423(b)(3).]"

---

[4] All rule references are to the California Rules of Court.

After this statement the court sentenced Williams on his murder conviction, withholding the death penalty but imposing life imprisonment without possibility of parole. The court then imposed an upper term for burglary, stating "[t]he Court has already placed on the record its reasoning for adopting the upper term." The court concluded by imposing an upper term for rape, stating "[t]he Court has already put on the record its reasoning for selecting the upper term."

■ The court adequately stated its reasons for imposing upper terms on Williams' rape and burglary convictions. Although preferred practice would have sentencing courts state reasons separately for each term imposed, for purposes of appellate review the court's incorporation by reference of its prefatory remarks sufficiently reveals its reasons for imposing two upper terms. (See *People* v. *Hetherington* (1984) 154 Cal.App.3d 1132, 1142 [201 Cal.Rptr. 756].)

Furthermore, it was not improper for the court to rely on the same facts to impose both upper terms. (*People* v. *Price* (1984) 151 Cal.App.3d 803, 811-812 [199 Cal.Rptr. 99].)

■ As for Williams' third argument, neither the statutory nor rule-created dual use bar applies to multiple upper base terms. (*People* v. *Price, supra,* 151 Cal.App.3d at p. 812.) Although the crime-related facts relied on under rule 421(a) must be relevant to each specific count (see *ibid.*), we conclude the failure of the court to delineate which facts applied to the respective counts was harmless. As a practical matter the court expressed itself in simple language why it was imposing the aggravated terms for the rape and burglary. Its later incorporation by reference to those factors was sufficient to justify the upper terms. Since the record amply supports the sentences it is not reasonably probable under the circumstances of these respective crimes that a remand for resentencing would produce a different result. We hold the court's sentencing error was harmless.

IV

Williams asserts the concurrent terms of six and eight years for the burglary and rape, respectively, must be stayed under section 654[5] pending

---

[5]Section 654 provides in part: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one . . . ."

completion of his sentence on his murder conviction. He claims the burglary, rape and murder constituted an indivisible course of conduct incident to a single criminal objective and intent, i.e., the rape of Deanna. ■ "The initial inquiry in any section 654 application is to ascertain the defendant's objective and intent. If he entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct." (*People* v. *Beamon, supra,* 8 Cal.3d at p. 639.) However, "if all the offenses are incident to one objective, the defendant may be punished for any one of them but not for more than one. [Citations.]" (*People* v. *Bauer* (1969) 1 Cal.3d 368, 376 [82 Cal.Rptr. 357, 461 P.2d 637, 37 A.L.R.3d 1398], cert. den., 400 U.S. 927 [27 L.Ed.2d 187, 91 S.Ct. 190].) "The proper procedure for remedying a violation of section 654 is to 'eliminate the effect of the judgment as to the less severely punishable offense insofar as penalty alone is concerned.' [Citation.]" (*In re Adams* (1975) 14 Cal.3d 629, 636-637 [122 Cal.Rptr. 73, 536 P.2d 473].)

The pertinent facts, as taken from Williams' opening brief, are: "After the appellant left the cafe, he want to the Brentwood Apartments. While at the apartments the defendants [*sic*] passed an open window, with the drapes pulled open. Inside the room an 11-year-old girl, Deanna [R.], was sleeping with the light on. The defendant entered their apartment through the kitchen door, walked into the living room, and passed a man sleeping on the couch. In the living room, the defendant picked up a flash light and shined the light around the room. [¶] The defendant then went into the room of the 11-year-old girl, Deanna [R.]. The defendant picked up a television in the room, *but as he was leaving the victim awoke.* The defendant placed his hand over the victim's mouth, pulled down her pants, and had sexual intercourse with her. He may have accidentally sodomized her. When the defendant left the room carrying the television, the victim was moaning and trying to push herself towards the head of the bed . . . . [¶] Deanna was found dead the next morning at approximately 9 a.m. The pathologist testified that the cause of death was strangulation." (Italics added.)

■ From these facts we discern two criminal objectives motivating Williams' conduct. First, there was the burglary for the purpose of theft. Second, there was the rape. The burglary for the purpose of theft was complete once Williams entered Deanna's room, took her television set and started to leave. It was only as he was leaving that Deanna woke up and Williams went over to her. Only *then* did he form the intent to rape. Given the divisibility of his theft conduct, Williams may be punished separately for the burglary. The rape and murder, however, were incidental to each other

and to Williams' objective to rape Deanna. The Attorney General virtually concedes multiple punishment for the rape and murder violates section 654. Consequently, the trial court upon resentencing must stay the sentence previously imposed for rape. (*In re Adams, supra,* 14 Cal.3d at pp. 636-637.)

Williams finally argues his rape and burglary convictions must both be reversed because one or both of them served as the basis for convicting him of first degree felony murder in violation of state and federal constitutional guarantees against double jeopardy. Even if Williams was convicted of first degree murder under a felony murder theory, his argument is meritless. ▇ With respect to the California Constitution, "the constitutional guarantee [against double jeopardy] has no application to the service of a sentence, but applies only to twice being put upon *trial* for the same offense. [Citation.]" (*In re Wilson* (1925) 196 Cal. 515, 524 [238 P. 359], original italics; accord *People* v. *Carter* (1975) 48 Cal.App.3d 369, 375 [121 Cal.Rptr. 677]; see also 1 Witkin, Cal. Crimes (1963) §§ 184, 207.) Williams, of course, has been tried only once. As for the United States Constitution, "the Fifth Amendment guarantee against double jeopardy . . . has been said to consist of three separate constitutional protections. It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." (*North Carolina* v. *Pearce* (1969) 395 U.S. 711, 717 [23 L.Ed.2d 656, 664-665, 89 S.Ct. 2072], fns. omitted.) The first two protections afforded by the federal double jeopardy clause are inapplicable here. The applicability of the third protection is moot in light of our section 654 holding immediately above.

### Disposition

The judgment of conviction is modified by reducing Williams' murder conviction from first to second degree and by striking the rape and burglary special circumstance findings. As modified, the judgment is affirmed. The matter is remanded for resentencing on second degree murder and upon resentencing the court shall stay the sentence previously imposed for rape.

Work, J., concurred.

**STANIFORTH, Acting P. J.**—I concur as to parts I, III and IV; I concur as to part II only under compulsion of Penal Code sections 1157 and 1192.