Filed 10/6/14

<u>CERTIFIED FOR PARTIAL PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>             v.<br><br>VEDGREN DEPATRICK JONES,<br><br>      Defendant and Appellant. | F066467<br><br>(Super. Ct. No. F11904306)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County. Wayne R. Ellison, Judge.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Wanda Hill Rouzan, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

*      Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, only the Introduction, part I of the Discussion, and the Disposition are certified for publication.

## INTRODUCTION

Vedgren Depatrick Jones (defendant) stands convicted, following a jury trial, of first degree murder (Pen. Code,[1] § 187, subd. (a); count 1) and second degree robbery (§ 211; count 2). He was sentenced to a total unstayed term of 25 years to life in prison, and ordered to pay restitution and various fees, fines, and assessments. In the published portion of this opinion, we hold that a verdict finding defendant "[g]uilty of violation of section 187(a) of the Penal Code, a felony, first degree murder …, as charged in … the information" (boldface & some capitalization omitted) satisfies the requirement that the jury expressly find the degree of the crime even though the information charged generic murder without specifying the degree. In the unpublished portion of this opinion, we conclude the trial court did not abuse its discretion when it did not suspend jury deliberations. Accordingly, we affirm the judgment.

## FACTS[*]

### I

### PROSECUTION EVIDENCE

Seventy-one-year-old Clifford Byrn maintained an account with a bank in downtown Fresno. Slightly more than $1,000 was deposited into his account around the first and third of each month in the form of Social Security benefits and money from his family. Typically, Byrn would withdraw $1,000 in cash in the first few days of each month. On Wednesday, June 1, 2011, he came into the bank and withdrew $85.[2] On June 3, he made his usual $1,000 withdrawal. Surveillance cameras at the bank showed defendant, an occasional resident of the Fresno Rescue Mission, was with Byrn on June 3.

---

[1]  All statutory references are to the Penal Code.

[*]  See footnote, *ante*, page 1.

[2]  Unspecified references to dates in the statement of facts are to the year 2011.

Byrn was a regular customer at the Ambassador Inn and Suites, a motel located on Olive Avenue, west of Highway 99, in Fresno. He would check into the motel around the first of every month, and stay for four to six days, until his money ran out. He would go to the liquor store across the street and nearby fast food restaurants during his stay.

Byrn checked into the motel on June 1. As was his habit, he paid cash for one night at a time. The motel's manager saw him the second or third night of his stay. One time, he was walking toward the McDonald's. The other time, he was walking straight to the liquor store. One time he was alone, and one time someone was with him.

Surveillance footage from the nearby Kentucky Fried Chicken (KFC) showed Byrn and defendant in the establishment shortly before 2:00 p.m. on June 3. Byrn paid for his purchases with cash he took from his left front pocket. The assistant manager recalled him having a large amount of bills. It appeared Byrn and defendant were together, and the food was being purchased for both of them.

On Sunday, June 5, a motel employee let herself into Byrn's room to clean it. Upon opening the door, she saw a pair of feet between the beds. The police were called.

Officers Dupras and Smith arrived around 1:15 p.m. Upon entry into the room, Dupras found Byrn lying face up on the floor between the two beds with a large Bud Ice beer bottle protruding from his mouth. It appeared Byrn had been dead for some time, as there was no pulse, lividity had set in, and the body was cold to the touch. No one else was in the room.

The room was in disarray. The thermostat was set at 85 degrees, and the heater was putting out hot air. The television was on. KFC containers, plastic bags, and food receipts dated June 3 were in the kitchenette area. There was also a receipt from McDonald's from late in the morning of June 4.[3] There were two table settings. One

---

**3** Surveillance video from this transaction showed Byrn, but not defendant. Alta Franklin, the floor manager for this McDonald's, saw defendant come into the restaurant twice daily for about a month. Byrn almost always came in with one of two younger

3.

plate was empty and the other had some food left on it. In the refrigerator were leftovers from KFC and one full Bud Ice bottle.[4] In a trash bag next to the entrance door were two empty Bud Ice bottles. Multiple shards of broken glass and reddish stains that appeared to be blood were on the westernmost bed, which was the bed closest to the bathroom and Byrn's body. The mattress of the other, easternmost bed nearest the entrance door was askew, with part of the top of the box spring exposed, and with what appeared to be blood stains on the sheet. An ashtray, drinking cup, and cigarette butt were on top of the box spring. The nightstand was disheveled. Another ashtray, cigarette butts, an empty pack of cigarettes, and a set of dentures were on the floor next to Byrn's body. Also next to the body, leaning partly into the nightstand, was a trash can containing two empty Bud Ice bottles and a vodka bottle.

Lying across Byrn's neck was a pillowcase containing shards of broken glass that were consistent with a beer bottle. The bottle in his mouth had been pressed into it with "sufficient enough pressure" to preclude the liquid in the bottle from leaking out, despite the fact the cap on the bottle was not "screwed on tightly." A portion of a palm print was found on the bottom of the bottle. This print matched defendant's right palm.

Byrn's left front pants pocket was turned inside out. His wallet was in his jeans, but it contained no money.

DNA profiles obtained from blood located on the bottom, and on the base of the neck, of the bottle in Byrn's mouth were consistent with Byrn's DNA. Bloodstains on Byrn's pants, including within the pocket that was turned inside out, were consistent with

males — occasionally, a Caucasian male in his early 20's, but 90 percent of the time, defendant. Byrn would purchase a meal for the Caucasian individual, which was a common thing for people in the area to do for the homeless. When Byrn and defendant came in together, however, defendant would wait while Byrn purchased coffee for himself, then they would leave.

[4]     All the intact Bud Ice bottles were 32-ounce size.

Byrn's DNA. One of defendant's fingerprints was found on the beer bottle in the trash bag.

At autopsy, it was determined Byrn was five feet nine inches tall and weighed 126 pounds. Because of decomposition, which was hastened by the heater being turned on in the motel room, the time of death would not be determined. There were multiple external injuries (contusions, abrasions, and lacerations) to the head, neck, and extremities, with splinters of glass visible in the laceration on the left side of the forehead.[5] There was some pooling of blood in the base of the tongue at the back of the throat, but no obvious contusion. Internally, there was bleeding under the scalp that corresponded to external injuries. There was also subdural and subarachnoid hemorrhage covering both parietal lobes of the brain. A significant amount of force was required to cause these types of injuries, which in this case were fairly extensive.

The cause of death was head injury due to multiple blunt impacts. Because the bottle was inserted all the way to the windpipe, it was possible compromised air flow could have contributed to the cause of death.

## II

### DEFENSE EVIDENCE

The parties stipulated Byrn's blood-alcohol level was 0.11 at the time of his death.

Defendant, who admitted having been convicted of a felony in Georgia in 2003, testified that he met Byrn near the Fresno Rescue Mission, where both were staying, about the third week in May. Byrn was passing out beers to some homeless people and asked if defendant wanted one. Because it was early in the morning, defendant declined, but sat and talked with Byrn for a while. When defendant returned later that evening,

---

[5] Of the 15 external injuries to the head and neck, one involved an external injury to the back of the head. The others were to the front or side.

5.

Byrn was sitting in the same spot.  This time, defendant accepted his offer of a beer.  From that point on, defendant saw Byrn every day.

One day when no one was around, Byrn remarked that he thought defendant might have a big penis.  Defendant responded, "Some people say that I do."  Byrn laughed and asked if defendant wanted to go to a motel with him on the first of the month.  Defendant kind of "blew him off" at first, but Byrn kept asking for about a week.[6]

The night before the first of the month, Byrn asked if defendant was going to go with him in the morning to cash his check.  Defendant said yes.  The next morning, defendant waited at the bus terminal while Byrn went into the bank.  When Byrn returned, the two went to the Ambassador Inn and Suites.  There, Byrn gave defendant some money and asked him to get some beer.  Defendant went across the street to buy beer and cigarettes, while Byrn went into the motel and registered.

Byrn gave defendant a $50 bill for the beer and cigarettes, which came to less than $20.  Byrn told defendant to keep the change.  Defendant and Byrn had not worked out what was going to go on, but defendant assumed a man of Byrn's age might want "to play a little bit."  That first day, however, there was no sexual activity.  They drank all day and watched basketball, then went to bed.

Early on June 2, Byrn asked if he could give defendant oral sex.  Defendant agreed.  After, Byrn gave defendant $20 to go to McDonald's, then again told defendant to keep the change.  That day, defendant went back and forth to the store about four times, getting beer and cigarettes.  Both men drank a lot; defendant was drinking vodka, while Byrn was drinking Bud Ice.  Byrn gave defendant money every time, then told him to keep the change.

---

[6]     Defendant was straight, but had "messed with" men in the past, sometimes for money.

On June 3, Byrn said defendant was going to go to the bank with him, because Byrn wanted to take defendant shopping on the way back and get him some clothes. They took the bus to the bank, and Byrn had defendant go inside with him this time. Defendant saw Byrn get the money; Byrn told him it was $1,000. Byrn then bought defendant some clothes at a store on the Fulton Mall. At Byrn's direction, they then took a bus to a bar Byrn liked. They arrived around noon and sat on the patio, drinking beer. After they both were "feeling pretty good," they took the bus back to the motel, put the clothes in the room, and went to KFC. After they got back from KFC, Byrn asked defendant to give him oral sex. Defendant said he did not do that. Byrn then asked if defendant would perform anal sex, but defendant refused.

On June 4, Byrn said he was going to McDonald's to get something to eat. Defendant remained in bed, asleep. When Byrn returned, he ate and the two talked a while. Byrn then asked if defendant wanted to drink again, and defendant agreed. Byrn asked if defendant wanted to walk to the store with him, but defendant declined, because he had not eaten anything since the day before and was feeling nauseated.

When Byrn returned, defendant started drinking liquor again. Byrn asked over and over for defendant to perform oral sex on him. Defendant refused. He went into the bathroom and threw up. When he returned, he lay down on the bed closest to the door with his back to Byrn, who was sitting on the bed, smoking a cigarette. Byrn kept asking defendant to perform oral sex on him. Byrn cussed and angrily said he had been giving defendant money, so why would defendant not "do it on" Byrn like Byrn had been "doing it on" defendant? He then hit defendant with a bottle several times on the back of the head.

Defendant turned to get out of bed, and Byrn struck him on the arms. Defendant kicked Byrn, who went "all the way over into his bed."[7] Defendant jumped on him and

---

[7] The force of the kick was what shifted the mattress on defendant's bed.

7.

got the bottle from him; the bottle was inside a pillow case. Defendant struck Byrn multiple times on the head and side of the face with it. Byrn was trying to stop defendant from hitting him. At this point, defendant was hitting Byrn because Byrn had hit him. By now, defendant did not feel as though he needed to defend himself, although Byrn was still kicking and fighting.

Defendant and Byrn, who both were drunk, were on the bed. When defendant struck Byrn the final time, the bottle broke. Defendant got off of Byrn. Byrn stood up and asked something like, "Why didn't you just do it to me? I did it for you, you know." Defendant was angry, because he had already told Byrn he did not want to do it. He pushed Byrn, who fell and hit the back of his head on the nightstand.

Defendant dropped the pillow case after the bottle broke and the glass started coming out of it. Because Byrn had kept asking for oral sex, defendant shoved the other bottle into Byrn's mouth and told him to "suck this." Byrn was still conscious at that point. Defendant did not call for help; he had never called the police, probably because, given the fact he had been in trouble in the past, he was scared.

Defendant believed the fight happened around 3:00 p.m. or shortly after. At some point, Byrn was no longer breathing and defendant realized he was dead. Defendant then took slightly more than $500 from Byrn's left pocket, and he left town on a bus. He was picked up for jaywalking in Las Vegas on July 7.

Defendant did not hit Byrn once Byrn was on the ground. Defendant did not mean for it to happen and did not want to hit Byrn at all, but felt like he had to defend himself. He was younger and bigger than Byrn (in his early- to mid-30's, six feet tall, and approximately 160 pounds), and did not know how much force he was using. Apparently, he used too much.

## DISCUSSION

## I

### THE JURY'S VERDICT SATISFIES THE REQUIREMENT OF SECTION 1157.

Count 1 of the information charged that "the crime of MURDER, in violation of PENAL CODE SECTION 187(a), a felony, was committed by [defendant], who did unlawfully, and with malice aforethought murder" Byrn. The prosecutor presented two theories of first degree murder to the jury (robbery felony murder and premeditation) and jurors were instructed on both, as well as on second degree murder, voluntary manslaughter based on heat of passion and imperfect self-defense, and justifiable homicide based on self-defense. Jurors returned a verdict finding defendant "**Guilty** of VIOLATION OF SECTION 187(a) OF THE PENAL CODE, a felony, FIRST DEGREE MURDER …, as charged in Count One of the Information filed herein."

Defendant now contends that, because the information was silent as to degree and the jury was not asked to return, and did not return, any specific finding on the truth of either theory of first degree murder, the language of the verdict form, read in conjunction with the information, "demonstrates the jury failed to determine the degree of the crime as required by section 1157. Therefore, the verdict must be fixed as murder in the second degree." We disagree.[8]

"[A]n information charging murder in violation of section 187 is sufficient to support a first degree murder conviction. [Citations.]" (*People v. Harris* (2008) 43 Cal.4th 1269, 1294.) Jurors need not unanimously agree on a theory of first degree murder (*People v. Kipp* (2001) 26 Cal.4th 1100, 1132), although they must unanimously find the degree of the crime (see *People v. Thomas* (2012) 53 Cal.4th 771, 815-816).

---

[8]  Defendant did not object to the wording of the verdict forms or otherwise raise the issue in the trial court. Nevertheless, the Attorney General does not claim the issue has been forfeited for purposes of appeal. We assume the issue is properly before us. (See *In re Birdwell* (1996) 50 Cal.App.4th 926, 930-931 & cases cited.)

Section 1157 states:  "Whenever a defendant is convicted of a crime … which is distinguished into degrees, the jury … must find the degree of the crime … of which he is guilty.  Upon the failure of the jury … to so determine, the degree of the crime … of which the defendant is guilty, shall be deemed to be of the lesser degree."**9**

"Section 1157 applies 'whenever the jury neglects to explicitly specify the degree of the crime' in the verdict form [citation]."  (*People v. San Nicolas* (2004) 34 Cal.4th 614, 634; accord, *People v. McDonald* (1984) 37 Cal.3d 351, 381, overruled in part by *People v. Mendoza* (2000) 23 Cal.4th 896, 910, 914 [§ 1157 does not apply where trial court instructs jury only on first degree felony murder and to find defendant either not guilty or guilty of first degree murder; where only crime of which defendant may be convicted is first degree murder, question of degree is not before jury].)  "Courts have consistently applied sections 1157 and 1192 strictly and literally in favor of defendants, so much so that 'on this point, form triumphs over substance, and the law is traduced.' [Citations.]"  (*People v. Williams* (1984) 157 Cal.App.3d 145, 153; accord, *People v. Goodwin* (1988) 202 Cal.App.3d 940, 946.)

Section 1157's requirement that the degree be specified "may be satisfied in two ways:  (1) by a finding that specifically refers to the degree of the crime by its statutory numerical designation; and (2) by findings that encompass the statutory factual predicates of the degree of the crime.  [Citation.]"  (*In re C.R.* (2008) 168 Cal.App.4th 1387, 1391.)  In the present case, the jury's verdict explicitly specified a finding of first degree murder.  Section 1157's requirement thus was satisfied.

That the verdict referred to the crime "as charged in … the Information," and the information merely charged generic murder without specifying the degree thereof, does not change this, nor does the fact there was no separate finding as to degree.  (Cf. *People*

---

**9**     Section 1192, the counterpart of section 1157, requires the court to determine the degree of the crime before passing sentence in cases of court trial or guilty plea.

*v. Nunez and Satele* (2013) 57 Cal.4th 1, 50 [§ 1157 not implicated where verdict found defendant guilty of willful, deliberate, premeditated murder, in violation of § 187, as such finding was equivalent to finding of first degree murder]; *People v. San Nicolas, supra,* 34 Cal.4th at pp. 634-635 [§ 1157 not implicated where verdict stated jury found defendant guilty of murder in violation of § 187, as charged in information, and further found defendant acted willfully, deliberately, and with premeditation]; *People v. Golston* (1962) 58 Cal.2d 535, 539-540 [where information charged generic murder, without reference to degree, § 1157 satisfied where trial judge, as trier of fact, stated defendant was guilty of first degree murder].) This was not a situation where, for instance, the jury's verdict used a descriptive label rather than specifying the degree by number, and so resort to the charging language of the information was needed, or at least helpful. (Cf. *People v. Goodwin, supra,* 202 Cal.App.3d at p. 947 [degree sufficiently specified where verdict form found defendant guilty of residential burglary as charged in information, and information alleged burglary of inhabited dwelling, which necessarily constituted first degree burglary].) It was also not a situation where the verdict simply stated defendant was found guilty of murder as charged in the information (cf. *People v. Williams, supra,* 157 Cal.App.3d at pp. 154-155 [first degree murder verdict modified to second degree where court found defendant guilty as charged in information, and information merely alleged defendant committed murder with malice aforethought in violation of § 187, without reference to degree]) or where no degree was explicitly stated in the verdict and the degree had to be inferred from a special circumstance or other finding also made by the jury (cf. *People v. Bonillas* (1989) 48 Cal.3d 757, 769, fn. 4 [§ 1157 requires express finding of degree, even where finding of first degree murder can be implied from jury's true finding as to special circumstance]; *People v. McDonald, supra,* 37 Cal.3d at pp. 379-380, 382 [same]).

By enacting section 1157, "[t]he Legislature has required an express finding on the degree of the crime to protect the defendant from the risk that the degree of the crime

11.

could be increased after the judgment. [Citations.]" (*People v. Goodwin, supra,* 202 Cal.App.3d at p. 947.) There is no such danger here. Defendant nevertheless argues the verdict form "presents a legal impossibility -- a verdict stating first degree murder based on an information silent as to the degree." Combining the degree stated in the verdict with the information it incorporates "creates an incongruity and a legal impossibility," he says, and makes the verdict "unclear," thereby bringing section 1157 into play. Again, we disagree.

Section 1157 requires that the jury find the degree of the crime and explicitly specify that degree in the verdict form. The verdict here expressly states a finding of first degree murder. """"A verdict is to be given a reasonable intendment and be construed in light of the issues submitted to the jury and the instructions of the court." [Citations.]' [Citations.] 'The form of a verdict is immaterial provided the intention to convict of the crime charged is unmistakably expressed. [Citation.]' [Citation.] '[T]echnical defects in a verdict may be disregarded if the jury's intent to convict of a specified offense within the charges is unmistakably clear, and the accused's substantial rights suffered no prejudice. [Citations.]' [Citation.]" (*People v. Jones* (1997) 58 Cal.App.4th 693, 710-711; accord, *People v. Jones* (2003) 29 Cal.4th 1229, 1259.)

Here, the jury's intent to convict defendant of first degree murder is unmistakably clear. With respect to count 1, jurors were instructed they would be given verdict forms for guilty of first degree murder, guilty of second degree murder, guilty of voluntary manslaughter, and not guilty. They were told they had to all agree on the decision to return a verdict of guilty or not guilty, to complete and sign only one verdict form per count, and to return the unused verdict forms unsigned. As for count 1, they were expressly told that if they all agreed the People had proved defendant was guilty of first degree murder, they were to complete and sign that verdict form, and were not to complete or sign any other verdict form. They were further told their verdict on each count had to be unanimous.

12.

As to count 1, jurors completed and signed only the verdict form for first degree murder. The remaining verdict forms were returned unsigned. When defendant requested that the jurors be polled, the verdict form specifying first degree murder was read to them, and each affirmed it was his or her verdict.

Under the circumstances, the verdict form's reference to the information created no fatal uncertainty or ambiguity, and did not result in a legal impossibility. Because the degree of the crime was explicitly stated, defendant's substantial rights were not prejudiced. Defendant is not entitled to have the conviction reduced to second degree murder.

## II[*]

### THE TRIAL COURT RESPONDED APPROPRIATELY TO THE PROSECUTOR'S MISSTATEMENT OF THE LAW.

Defendant contends the trial court should have halted deliberations to correct the prosecutor's misstatement of the law of heat-of-passion voluntary manslaughter. He says its attempt to correct the error after the jury reached its verdicts was insufficient, and, as a result, he was denied various constitutional rights. We find no error.[10]

---

[*]     See footnote, *ante*, page 1.

[10]     A question arises whether, in light of defense counsel's failure to object to the prosecutor's initial misstatement of the law or to request a halt to deliberations, defendant's claim has been preserved for review. (See, e.g., *People v. McCleod* (1997) 55 Cal.App.4th 1205, 1220.) Because we are not confronted here with a claim of prosecutorial misconduct per se, but rather with an assertion the trial court erred in its response thereto and thereby violated defendant's federal constitutional rights, including his right to a fair trial, we find it appropriate to address the issue on the merits even assuming forfeiture might appropriately be found. (See *People v. Williams* (1998) 17 Cal.4th 148, 161-162, fn. 6; *People v. Espiritu* (2011) 199 Cal.App.4th 718, 725.) Accordingly, we do not address defendant's claim that any forfeiture constituted ineffective assistance of counsel.

## A.     Background

Counsels' summations preceded the giving of jury instructions.[11]  In his opening argument, the prosecutor stated:

> "The second way you get to voluntary manslaughter is through heat of passion -- a defendant killed somebody because of a sudden quarrel or in heat of passion if the defendant was provoked.  As a result of the provocation the defendant acted rashly and under the influence of intense emotion that obscured his reason or judgment and the provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.

> "Okay.…  And one example of -- kind of a heat-of-passion-type of defense would be you get off work early.  You decide you are going to run, home grab something to eat.  You get home at kind of an unexpected hour and you find your spouse in bed with somebody else.  And you are so absolutely outraged by what you see that you pick up a knife and you just stab her and him to death.  Right?  Because it is such a powerful emotion what you feel.  *And it's something that a reasonable person -- somebody else in your shoes would have probably responded the same way.*  It's built for those kind of situations.

> "So the question is the first one, was the defendant provoked?  If you believe his testimony that he's bonked a few times on the head, I guess it could be considered provocation.  As a result of the provocation the defendant acted rashly and under intense emotion that obscured his reasoning or judgment.  Maybe.  But this is the real issue, the provocation would have caused a person of average disposition to act rashly and without due deliberation.  That is from passion rather than from judgment.  So defendant's bonked a few times on the head.  He turns.  Kicks the victim away.  Disables the victim.  That should be the end of it.  *Would a reasonable person in the defendant's position then commence to beating the victim multiple times, hitting him on the head, causing 15 different types of injuries?  And then at the end shoving a bottle down his mouth.  Is that how a reasonable person in those circumstances would respond?*  The

---

[11]     As previously described, jurors were presented with a number of options as to count 1.  We summarize only the arguments and instructions concerning heat-of-passion voluntary manslaughter.

14.

answer to that is no. So voluntary manslaughter does not apply." (Italics added.)

In response, defense counsel argued there was a sudden quarrel, and the severity of Byrn's injuries showed defendant acted under the influence of intense emotion and his reasoning or judgment must have been obscured. Defense counsel then stated:

"Now, here's where the prosecution went wrong. They said would provocation have caused a person of average disposition to act rashly and without due deliberation from passion rather than judgment. And this is where I used to go wrong, because I think well, what kind of a person is going to react it [*sic*] a sudden quarrel by killing somebody? No average person is going to react to a suddenly [*sic*] quarrel by killing somebody…. But that's not the test. The test is not whether -- if you have any doubt about this at all, get a note to the judge because this is … a key to the case. If you go wrong on this, as my worthy opponent did … you will go wrong completely in this case.

"The question is: Would an average person be upset enough to obscure their judgment, not would an average person be upset enough to obscure the judgment and cause them to kill? So … you don't decide that the average person would react by killing, because they wouldn't. What you decide is would the average person react by getting upset, by having their reasoning, their judgment damaged? And once you reach that point then you are in the sudden quarrel or heat of passion."

In his closing argument, the prosecutor conceded defendant was provoked, but argued that was not enough because defendant was not allowed to set up his own standard of conduct. Thus, there had to be provocation to a sufficient level, which the prosecutor illustrated by again mentioning the adultery example and arguing it would cause a reasonable person to be overcome with fury. This ensued:

"[PROSECUTOR:] So there's the two things, the provocation, but then the reaction to the provocation still must be something that a person of average disposition -- the reaction, the response -- the law says the provocation would cause a person of average disposition to act rashly and without due deliberation. In other words, how then would a reasonable person react under those circumstances? *Would a reasonable person, seeing their spouse in bed with someone, be so overcome with fury that they would kill somebody?* Yes, you could see that a reasonable person, *an*

15.

*average person might do that.* It wouldn't be right. It would still be voluntary manslaughter, but you can see --

"[DEFENSE COUNSEL]: Objection, Your Honor. That misstates the law of voluntary manslaughter.

"THE COURT: Counsel, I think both of you have argued this. And ladies and gentlemen, you follow the instruction as I read it to you. Okay? Overruled.

"[PROSECUTOR]: The question for you is if you follow the -- the defendant's statement is the hitting on a head -- on the head *enough provocation that a reasonable person under those circumstances would turn and murder somebody. That is the question.*" (Italics added.)

Jurors were subsequently instructed to follow the law as the court explained it to them, and that, if the attorneys' comments on the law conflicted with the instructions, jurors must follow the court's instructions. With respect to heat-of-passion voluntary manslaughter, jurors were told, pursuant to CALCRIM No. 570:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.

"The defendant killed someone because of a sudden quarrel or in the heat of passion if: One, the defendant was provoked; two, as a result of the provocation the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; and three, the provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment. [¶] … [¶]

"It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition in the same situation and knowing the same facts would have reacted from passion rather than from judgment."

The jury retired to begin deliberations at 3:18 p.m. Defense counsel then expressed concern that the prosecutor had misstated the law contained in CALCRIM

16.

No. 570. Defense counsel pointed out that the instruction refers to provocation that would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than judgment, whereas the prosecutor had worded it as whether the person would be provoked to kill. Defense counsel noted that when the prosecutor repeated the original error in his closing argument, defense counsel's objection was overruled, suggesting to the jury that defense counsel's statement of the instruction was incorrect and that manslaughter could be found only if the killing would be a reasonable thing that an ordinary person would do. The prosecutor countered that his argument had been entirely consistent with the instruction.

The trial court stated it was "inclined" to think the prosecutor's argument to the jury was an incorrect statement of the law, but it noted it had directed jurors to follow the law as given to them by the court, and that CALCRIM No. 570 — as read to the jury — correctly stated the law. It decided that since it was 4:00 p.m., and the jury was unlikely to conclude its deliberations that afternoon, the attorneys could return in the morning with a proposed pinpoint instruction. When defense counsel stated he had already drafted one, the court said it needed some authority for the proposition the jury should be given an additional explanation beyond the standard jury instruction, and it also wanted to give the prosecutor the opportunity to explain why his argument was okay — a point the court had yet to decide. The court recognized that if defense counsel was right and the jury came back with a verdict, there might be grounds for a motion for a new trial based upon the jury having been misled about the requirements of the law on the subject. It gave the prosecutor until the next morning to present some authority why the jury should not be instructed along the lines of what defense counsel proposed.

The court directed counsel to return the next morning at 9:00. The jury was informally excused for the day at 4:30 p.m.

The next morning, court reconvened at 9:21 a.m. The court informed counsel the jury had been deliberating since 9:00 that morning.

The court provided counsel with a transcript of the pertinent portion of the prosecutor's closing argument and defense counsel's objection, a copy of CALCRIM No. 570 as given by the court, and a written proposal of the court in response to the situation. The prosecutor then argued, unsuccessfully, that he had not misstated the law.

At 9:38 a.m., the jury advised the bailiff they had reached a verdict. When the court informed counsel of that fact, the following took place:

"[DEFENSE COUNSEL]: Well, I ask that before accepting the verdict that the court read its post [*sic*] instruction.

"THE COURT: I'm going to do that. I don't think this is obviously a pressurized situation and a little bit surprising. But I am going to bring the jurors in and give them this instruction and ask them to -- understanding that they have indicated to us that they have arrived Alta [*sic*] verdict, that if there's any misunderstanding about the law on this subject matter that they would need to reconsider that. Okay? Anything else you want to do?

"[DEFENSE COUNSEL]: No. Thank you, Your Honor.

"[PROSECUTOR]: No. [¶] … [¶]

"(Whereupon the jury enters the courtroom.)

"THE COURT: Well, good morning, ladies and gentlemen.… I understand you have verdicts in this matter. However, you'll recall that there was an issue during closing argument about misstatements of the law. And I directed you to follow the instructions that I had given you. And after giving both counsel here an opportunity to investigate and research the law on this subject matter, I concluded, talking to them this morning, that we needed to give you a clarification in regards to the arguments that you heard from counsel so that you would understand the distinction that was drawn between these two parties in their closing argument.

"So I don't know how this might affect your decisions in this case. But given the fact that you've arrived at decisions, I want you to reconsider whatever decisions you've made in light of this additional instruction. I'm going to read it to you. But I'm also going to give a copy to [the court clerk] so she can hand it to you in writing so you don't have to try to get all of this necessarily.

"It's relatively brief but -- and straightforward. So here it is: During closing argument you heard from both counsel as to how to interpret instruction 570 which defines when a killing that would otherwise be murder is reduced to voluntary manslaughter, if the killing occurred because of a sudden quarrel or in the heat of passion. That instruction provides in part that any provocation which caused the defendant to act rashly and under the influence of intense emotion that obscured his reasoning or judgment must also be the kind of provocation which would have caused a person of average disposition to act rashly and without due deliberation, that is from passion rather than from judgment. Contrary to any suggestion in the People's closing argument, it is not required that such provocation be of a kind that would have caused a person of average disposition to kill.

"So that's it. I don't know whether it has any effect on what you've done here, but I want you to go back and reconsider it. And then if necessary, take other votes or whatever you need to do here. And then you can let the clerk know if you've arrived at verdicts in this matter."

The jury returned to the jury room to continue deliberating at 9:46 a.m. At 9:55 a.m., they informed the bailiff they had reached a verdict.

## B.     Analysis

"Manslaughter is 'the unlawful killing of a human being without malice.' [Citation.] A defendant lacks malice and is guilty of voluntary manslaughter in 'limited, explicitly defined circumstances,'" (*People v. Lasko* (2000) 23 Cal.4th 101, 108) one of which is "'when the defendant acts in a "sudden quarrel or heat of passion" [citation] ….' [Citation.]" (*Ibid.*) As the California Supreme Court has explained: "'[T]he factor which distinguishes the "heat of passion" form of voluntary manslaughter from murder is provocation. The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.] The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.] "Heat of passion arises when 'at the

19.

time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.'" [Citation.]' [Citation.]" (*People v. Manriquez* (2005) 37 Cal.4th 547, 583-584.)

"Heat of passion, then, is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation." (*People v. Beltran* (2013) 56 Cal.4th 935, 942.) Adequate provocation does *not* require a finding that an ordinary person of average disposition would kill. (*Id.* at p. 949.) "Adopting a standard requiring such provocation that the ordinary person of average disposition would be moved to *kill* focuses on the wrong thing. The proper focus is placed on the defendant's state of mind, not on his particular act. To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection.… [T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene. Framed another way, provocation is not evaluated by whether the average person would *act* in a certain way: to kill. Instead, the question is whether the average person would *react* in a certain way: with his reason and judgment obscured." (*Ibid*.) "The focus is on the provocation — the surrounding circumstances — and whether it was sufficient to cause a reasonable person to act rashly. How the killer responded to the provocation and the reasonableness of the response is not relevant …." (*People v. Najera* (2006) 138 Cal.App.4th 212, 223.)

The italicized portions of the prosecutor's statements, *ante*, are incorrect. (See *People v. Beltran, supra,* 56 Cal.4th at p. 954 & fn. 15; *People v. Najera, supra,* 138 Cal.App.4th at p. 223.) It is improper for a prosecutor to misstate the law, however unintentionally. (*People v. Hill* (1998) 17 Cal.4th 800, 822-823, 829.) Such impropriety normally is curable by admonition, however (see, e.g., *People v. Solomon* (2010) 49

20.

Cal.4th 792, 828; *People v. Combs* (2004) 34 Cal.4th 821, 854; *People v. Mayfield* (1993) 5 Cal.4th 142, 177-178), and here jurors were specifically told to follow the instruction on the subject as the court read it to them, and also generally to follow the court's instructions if they conflicted with the attorneys' arguments. Jurors were correctly instructed on the law of provocation by means of CALCRIM No. 570. (See *People v. Beltran, supra,* 56 Cal.4th at p. 954 & fn. 14.) We presume they followed these instructions. (*People v. Boyette* (2002) 29 Cal.4th 381, 436; *People v. Najera, supra,* 138 Cal.App.4th at p. 224.)

Defendant contends, however, that once the trial court determined the prosecutor misstated the law and defense counsel asked that the error be corrected, the court was required to suspend jury deliberations until the jury could be fully and properly instructed. Of course, the jury already had been fully and properly instructed pursuant to CALCRIM No. 570. (See *People v. Beltran, supra,* 56 Cal.4th at p. 954 & fn. 14.)

In any event, "from time to time during the trial, and without any request from either party, the trial judge may give the jury such instructions on the law applicable to the case as the judge may deem necessary for their guidance on hearing the case." (§ 1093, subd. (f).) "An appellate court applies the abuse of discretion standard of review to any decision by a trial court to instruct, or not to instruct, in its exercise of its supervision over a deliberating jury. [Citation.]" (*People v. Waidla* (2000) 22 Cal.4th 690, 745-746.) "The trial '"judge must always be alert to the possibility that counsel in the course of argument may have befuddled the jury as to the law. If this occurs, then either at the time the confusion arises or as part of the final instructive process the judge should rearticulate the correct rule of law."' [Citation.] The court has 'a duty to reinstruct if it becomes apparent that the jury may be confused on the law.' [Citation.]" (*People v. Ardoin* (2011) 196 Cal.App.4th 102, 128.) Moreover, "the order of procedure at the trial is within the discretion of the trial judge and must stand unless a clear abuse of discretion is shown. [Citations.]" (*People v. Seastone* (1969) 3 Cal.App.3d 60, 67; see

21.

§ 1094.)  Also subject to review for abuse of discretion is the trial court's decision whether to suspend deliberations.  (*People v. Santamaria* (1991) 229 Cal.App.3d 269, 276-277.)

"[D]iscretion is abused whenever the court exceeds the bounds of reason, all of the circumstances being considered.  [Citations.]"  (*People v. Giminez* (1975) 14 Cal.3d 68, 72.)  To the extent there was concern jurors might be confused or draw the wrong conclusion from the trial court's overruling of defense counsel's objection to the prosecutor's closing argument, the trial court acted reasonably in giving the parties until the next morning to present further argument and authority, and in allowing jurors to continue deliberating in the meantime.  Although it could have suspended deliberations for the time it took to consider the issue and determine whether to give a further instruction (see *People v. Cleveland* (2004) 32 Cal.4th 704, 755-756), defendant fails to convince us it was required to do so, especially in light of the instructions it had already given.  The trial court also acted reasonably once it learned the jury had reached a verdict. It did not "receive" the verdict, which was neither "returned" nor "complete" (see §§ 1149, 1164, subd. (a); *People v. Green* (1995) 31 Cal.App.4th 1001, 1009-1010; *People v. Crowell* (1988) 198 Cal.App.3d 1053, 1063), and the jury remained under its control (see *People v. Bento* (1998) 65 Cal.App.4th 179, 187).  Accordingly, it retained full authority to direct jurors to reconsider their verdict in light of its clarifying instruction.  (Cf. § 1161; *People v. Hendricks* (1987) 43 Cal.3d 584, 597.)

Defendant claims that by failing to have the verdict forms placed in an envelope by the foreperson and sealed, failing to provide the jury with a new packet of verdict forms, and then telling the jury it did not know what effect the clarification might have, the trial court implicitly signaled the verdicts were correct.  We fail to find any logic in this argument.  Defendant points to the fact the jury returned within five to 10 minutes of being sent out of the courtroom — barely enough time, he says, "to reach the jury room, sit down and contact the bailiff to indicate [the jury] had reached verdicts."  The clerk's

minutes show the jury actually was out nine minutes.[12] This was ample time for jurors to digest the court's clarification and determine whether it made any difference in their verdict on count 1, the only count affected. Since jurors had always been correctly instructed on the subject of provocation and heat-of-passion voluntary manslaughter, it is not surprising they quickly determined it made no difference.

Considering the circumstances, we reject defendant's claim the verdict "was a product of the jury having been misled by uncured prosecutorial misconduct," thereby violating various of his constitutional rights. "It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions. [Citation.]" (*People v. Gonzales* (2011) 51 Cal.4th 894, 940.) In light of those instructions and the trial court's clarification, it is not reasonably probable any possible confusion engendered by the prosecutor's misstatements or the trial court's overruling of defense counsel's objection thereto misled the jury. (See *People v. Beltran, supra,* 56 Cal.4th at p. 956.) The trial court did not err in its handling of the situation.

## DISPOSITION

The judgment is affirmed.

_____

DETJEN, J.

WE CONCUR:


_____

HILL, P. J.


_____

LEVY, J.

---

**12** The trial court stated the jury was out "perhaps five or ten minutes." In contrast to the court's estimate, the clerk's minutes stated the exact time the jury retired and returned.